# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| Colleen L. Rootes, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 3:11-CV-431 |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits to Plaintiff, Colleen L. Rootes.  For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).


BACKGROUND

On April 1, 2008, Plaintiff filed an application for Social Security Disability Benefits ("DIB"), under Title II of the Social Security Act, 42 U.S.C. section 401 *et seq.*  Rootes alleged an onset date of January 21, 2008, alleging she was disabled due to neuropathy, a spinal disorder, back, hip, and leg pain, carpal tunnel syndrome, hypertension, bone spurs and headaches.  The

Social Security Administration denied her initial application and also denied her claim upon reconsideration.

On January 21, 2010, Rootes appeared via video teleconference, represented by counsel, at an administration hearing before Administrative Law Judge ("ALJ") Michael Hellman. Testimony was provided by Rootes and Thomas Grzesik, a vocational expert. On March 26, 2010, ALJ Hellman issued a decision denying Rootes' claims, and finding her not disabled because she could perform a significant number of jobs in the national economy, despite her limitations. (Tr. 26-39.)

Plaintiff requested that the Appeals Council review the ALJ's decision, but the request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a). Plaintiff has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).


DISCUSSION

Facts

Medical Evidence

On January 9, 2008, Rootes told her family doctor, Dr. Thomas M. Browne, that her hips/legs hurt, they felt numb, and her feet burned. (Tr. 327.) She then began treatment with vascular neurologist Virgil A. DiBiase, M.D., for severe bilateral hip pain,

burning in her legs and feet, numbness in her lower legs and arms, and neck pain. (Tr. 291.) The physical examination found reduced muscle strength in the bilateral iliopsoas bilaterally, hyperreflexic reflexes generally, and an absent deep tendon reflex in the right ankle. (Tr. 292.) The diagnoses were neck pain, cervical radiculopaty, numbness, poly and peripheral neuropathy, and excessive daytime sleepiness. (Tr. 292-93.)

On February 8, 2008, Rootes underwent an electromyography performed by Dr. DiBiase, which showed ulnar motor neuropathy with evidence of compression at the elbow on the left and bilateral mild sensory carpal tunnel syndromes. (Tr. 249, 303.) Patient history indicated hip pain and numbness in her feet and hands. (Tr. 250, 253, 304, 307.) An MRI revealed spondylitic changes in the lumbar spine, bulging of the annulus fibrosis at L5-S1 extending into the neuroforamina with contact of the dorsal root ganglia bilaterally, a right foraminal L4-L5 osteophyte and disc complex with mild lateral displacement of the right L4 dorsal root ganglion, and a left paraspinal lipid containing an entity consistent with an intramuscular lipoma. (Tr. 300.) Moreover, a cervical spine MRI revealed moderate central spinal canal stenosis at C6-C7 from a disc herniation and osteophyte complex and contact of the ventral cord surface and neural foraminal narrowing at multiple levels, especially on the left at C6-C7 and right at C5-C6. (Tr. 313.)

Followup testing with Dr. DiBiase on February 18, 2008, found

reduced muscle strength in the bilateral iliopsoas, hyperreflexic reflexes, and an absent deep tendon reflex in the right ankle. (Tr. 316.) The diagnoses were excessive daytime sleepiness, numbness, carpal tunnel syndrome, cervical radiculopathy, ulnar entrapment, leg pain, and chronic pain. (Tr. 316-17.)

Rootes started physical therapy on February 27, 2008. The initial evaluation revealed she had increased pain in her lower back and extremities after 10-15 minutes of sitting, increased pain in her lower extremities in less than half a minute of walking, increased bilateral lower back, hip and lower extremity pain when sleeping, immediate pain from driving, tenderness bilaterally in the hips, and tightness bilaterally in the upper trapezius. (Tr. 260.) She also had reduced ranges of motion. (Tr. 319.) Identified problems were pain, restricted flexibility, decreased muscle strength, and decreased activity tolerance. (Tr. 260.) The next day, Rootes received rehabilitation for her pain and numbness. (Tr. 268.)

Plaintiff also reported dropping items from both her hands. (*Id.*) The physical examination also noted decreased grip strength and pinch strength. (*Id.*) Plaintiff also had several other physical therapy sessions in March 2008. (Tr. 263-66). On March 13, 2008, Plaintiff reported that "I can't feel my hands or arms at all," on March 25, 2008, she told the physical therapist the pain was still a 9 out of 10 and going down her lower extremities, and

on March 6, 2008 she was issued a night splint for her arm. (Tr. 263, 270, 274.)

On March 31, 2008, Plaintiff returned to Dr. DiBiase who opined the occupational therapy had failed in treating her ulnar entrapment and carpal tunnel syndrome. (Tr. 323-24.) The physical examination again found reduced muscle strength in the bilateral iliopsoas bilaterally, hyperreflexic reflexes generally, and an absent deep tendon reflex in the right ankle. (Tr. 323.) At another visit on April 3, 2008, Plaintiff was still having back and leg pain. (Tr. 352.)

Then, on April 24, 2008, orthopedic surgeon Dr. N. Nenadovich, examined Rootes on a referral from Dr. Browne, and his impression was cervicolumbar spondylosis, degenerative disc disease with a disc herniation in the cervical spine, foraminal stenosis, and he thought Roots also had peripheral neuropathy in the lower extremities. (Tr. 337.) The physical examination found some decreased sensation in the digits of the left hand, decreased sensation diffusely throughout the lower extremities from the hips down, an antalgic gait with shortened stance phase in the left lower extremity secondary to discomfort particularly in her hip area, and some difficulty toe-walking. (*Id.*)

Soon thereafter, on May 13, 2008, board-certified pain management specialist and anesthesiologist Dr. Heather A. Nath, of the Lakeshore Bone and Joint Institute treated Rootes for lower

back pain radiating into her legs bilaterally and upper arm complaints that made it difficult to carry things. (Tr. 420.) Plaintiff described the pain as numbness, tingling, burning, aching, throbbing, sharp and dull, with some weakness and rated it at 8 out of 10 in severity generally, and 10 out of 10 when it was bad and was aggravated by walking, lying, and sitting. (*Id.*) The physical examination also found some tenderness over the sacroiliac joint and Dr. Nath continued to prescribe her Vicodin and increased her Cymbalta to 60 mg every morning. (*Id.*)

On June 16, 2008, family medicine practitioner Ralph E. Inabnit, D.O., conducted a physical examination at the request of the Disability Determination Division, diagnosing Plaintiff with cervical spine spasm and pain, lumbar spine spasm and pain, osteoarthritis and neural foraminal narrowing at multiple levels of the cervical spine, osteoarthritis and facet arthropathy at multiple levels of the lumbar spine, spondylolysis of the lumbar spine, spinal stenosis of the cervical spine at C6-C7, hypertension, and obesity. (Tr. 366.) The physical examination found a reduced motor strength (4/5 in the lower and upper extremities), reduced reflexes (upper extremities at 2/5 bilaterally, knee jerks and ankle jerks at 1/5 bilaterally), a reduced range of motion in the cervical spine, and a reduced range of motion in the lumbar spine. (Tr. 360, 362-63.)

Shortly thereafter, Alan Wax, Ph.D., conducted a psychological evaluation on June 18, 2008, at the request of the Disability Determination Division, and diagnosed Plaintiff with a dysthymic disorder and a GAF score of 59. (Tr. 367, 369.) His clinical observations were that her mood and affect were somewhat flat, that she rocked either side to side or back and forth during the entire evaluation due to pain, and had some memory problems. (Tr. 368.) He also noted Rootes could be capable of managing her funds, but would benefit from assistance. *Id.* at 369. Finally, Dr. Wax opined that "[s]he is disabled due to medical problems and Depression." *Id.*

A few days later, Plaintiff returned to Dr. Nath on June 25, 2008 for neuropathy with a throbbing, aching, and numb pain rated at 8 out of 10 in severity. (Tr. 422.) It was also noted Rootes' sleep had worsened, there was a decrease in her activity, and she was sitting in the chair "rubbing her leg stating that her neuropathy was worse." (Tr. 422-23.)

Then, on July 1, 2008, non-examining State-agency reviewer Kenneth Neville, Ph.D., completed a psychiatric review technique, and diagnosed Plaintiff with an affective disorder (dysthymic disorder), but found it non-severe. (Tr. 373, 376.) Due to this condition, he opined Plaintiff would have mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace. (Tr. 383.) J. Gange, Ph.D., affirmed this

assessment on October 21, 2008.  (Tr. 434.)

Dr. Nath treated Plaintiff again on July 22, 2008 for neuropathy, lower back pain, lumbar radiculopathy, and bilateral wrist pain with the pain overall rated at 8 out of 10 in severity and described as throbbing, burning, sharp, aching, and numbing. (Tr. 425).  She was still wearing splints on her arms and also noted that the Gabapentin was no longer working after two weeks. (*Id.*)  Consequently, Dr. Nath increased her Gabapentin to 600 mg in the morning and 1200 mg at night while she continued the Cymbalta at 30 mg twice per day, a blood pressure pill, and Vicodin at 7.5 mg four times a day.  (*Id.*)

On July 23, 2008, non-examining State-agency reviewer and family medicine practitioner M. Ruiz, M.D., completed a physical residual functional capacity assessment, and found Rootes was limited to lifting 20 pounds occasionally and 10 pounds frequently, standing or walking about 6 hours in an 8-hour workday, and sitting about 6 hours in an 8-hour workday, occasionally climbing, balancing, stooping, kneeling, crouching, and crawling and avoiding concentrated exposure to extreme temperatures, wetness, humidity, and should avoid even moderate exposure to fumes, odors, gases, poor ventilation and hazards.  (Tr. 408-09, 411.)  Internist Fernando R. Montoya, M.D., affirmed this assessment on October 20, 2008. (Tr. 433.)

Thereafter, Dr. Nath once again treated Plaintiff on September

9, 2008, for low back pain, neuropathy, lumbar radiculopathy, and bilateral wrist pain. (Tr. 429.) Plaintiff reported she could no longer afford Cymbalta. (*Id.*) The physician decided to maintain her on Neurontin and Vicodin and added Effexor XR, but removed Cymbalta from her treatment. (*Id.*) Soon thereafter, Plaintiff was treated by Dr. Nath again on November 4, 2008 for pain that was still rated at 8 out of 10 in severity despite compliance with her treatment plan. (Tr. 440.) The physician decided to increase her Effexor dosage to 150 mg in the morning and continue her Vicodin at 4 times a day and Neurotonin at 600 mg three times a day. (*Id.*)

Then, on April 8, 2009, Dr. Nath treated Rootes for her history of lower back pain, neck pain, wrist pain, and carpal tunnel syndrome with the pain rated at 7 out of 10 in severity overall and described as throbbing, burning, aching, cramping, and numbing. (Tr. 437.) At the time she had been prescribed Vicodin 7.5 one dosage every 6 hours, Neurontin 600 mg three times a day, but the physician added Cymbalta again and Diclofenac at 75 mg twice a day and discontinued Effexor. (*Id.*)

Plaintiff then returned to Dr. Nath on November 11, 2009, and it was noted she had "no changes in her overall health." (Tr. 444.) Her medication treatment was continued with Vicodin one dosage every 6 hours, Voltaren 75 mg twice a day, Cymbalta 60 mg, and Neurontin 600 mg three times a day. (*Id.*)

Finally, on January 12, 2010, Dr. Nath issued a medical source

statement, noting that her lifting, carrying, walking, standing, pushing, and pulling were affected by her condition and that she could never climb, balance, kneel, crouch, crawl, or stoop, and had limited handling (gross manipulation), fingering (fine manipulation), and feeling. (Tr. 446-49.)

### Rootes' Hearing Testimony

Rootes testified that she stopped working mainly due to the numbness in her legs, arms, and even face that began in January 2008. (Tr. 52-53.) The numbness is constant and causes her to drop things "all the time," requires her to "hold onto a cart when [she is] going to the grocery store" (Tr. 53), and she is afraid of driving. (Tr. 55.) Plaintiff further testified to pain from the bottom part of her back to her feet that was rated at 11 or 12 on a scale of 1 to 10. (Tr. 54.) To relieve the pain, she "rock[s] a lot" when sitting, and tries to stand and walk around before sitting down "because [she] can't do either one of them very long." (Tr. 55.) Plaintiff also stated she could sit for 15 to 20 minutes at a time, and during the hearing, she stood up from her chair. (Tr. 55, 57, 61.) She could also walk to the corner in her neighborhood, which was five houses down from her residence, before having to stop. (Tr. 61.)

Plaintiff was wearing arm splints at the hearing to keep her wrists from bending due to the pain in her arms and hands and

numbness in the tips of her fingers.  (Tr. 58.)  Rootes testified that she drops items, such as a glass, approximately ten times a day.  (Tr. 62.)  In 2008 or 2009, five pounds was the last amount her physical therapist recommended she lift.  (Ex. 61.)

Plaintiff lives with her two grandsons, ages thirteen and nine,  the older grandson "does everything his self" and the other is handicapped, but her sister, a friend, her soon-to-be ex-husband, and two neighbors help her with him.  (Tr. 49, 58-59.)  Rootes does, however, try to do the dishes and cook for the 13-year old grandson once a week, but he vacuums the house and Rootes testified she cannot finish a load of laundry.  (Tr. 60.)  Her sister helps her with paying the bills and keeping household finances.  (Tr. 60.)

Plaintiff's sister, Addonia Baugh, testified that she helps Plaintiff by doing all the driving to take her to doctors' appointments, and helps with her grandson on a daily basis. (Tr. 66.)  She also said she would help cook and clean the house occasionally.  (Tr. 66-67.)  Ms. Baugh also reported seeing Plaintiff experience numbness, drop items, and have problems grasping objects.  (Tr. 67.)  Finally, she has also seen Plaintiff's balance issues, for example, she "can't step up on stools or anything that puts her up a little bit" and that she has "very bad sleeping habits."  (Tr. 67.)

<u>Vocational Expert's Hearing Testimony</u>

Plaintiff's past work experience includes work as a working plastic production supervisor (DOT #556.130-010), which is at a light physical exertional level generally, but heavy as performed and skilled at SVP 7. (Tr. 68.) The ALJ first posited a hypothetical of an individual with Plaintiff's age, education, work experience, and skill set, who is limited to the light physical exertional level with occasional postural activities. (Tr. 68.) The VE responded that such an individual could perform Plaintiff's past relevant work as generally performed in the country. (Ex. 69.) The ALJ then posited a second hypothetical of an individual who required an at-will sit-stand option that would not be off task more than 10% of the work period. (Tr. 69.) The VE responded that such an individual would not be able to perform Plaintiff's past relevant work, but could work as a production assembler, (DOT #706.687-010), small parts assembler (DOT #706.684-022), and electronics worker (DOT #726.687-010). (Tr. 70.)


<u>Review of Commissioner's Decision</u>

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.* Substantial evidence is defined as "such relevant evidence as a

reasonable mind might accept as adequate to support a decision."
*Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining
whether substantial evidence exists, the Court shall examine the
record in its entirety, but shall not substitute its own opinion
for the ALJ's by reconsidering the facts or re-weighing evidence.
*Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). With that in
mind, however, this Court reviews the ALJ's findings of law de novo
and if the ALJ makes an error of law, the Court may reverse without
regard to the volume of evidence in support of the factual
findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB
or SSI benefits under the Social Security Act, the claimant must
establish that he is disabled. To qualify as being disabled, the
claimant must be unable "to engage in any substantial gainful
activity by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). To determine
whether a claimant has satisfied this statutory definition, the ALJ
performs a five step evaluation:

Step 1: Is the claimant performing substantial gainful
activity: If yes, the claim is disallowed; if
no, the inquiry proceeds to Step 2.

Step 2: Is the claimant's impairment or combination of
impairments "severe" and expected to last at
least twelve months? If not, the claim is
disallowed; if yes, the inquiry proceeds to

Step 3.

Step 3: Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to Step 4.

Step 4: Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to Step 5, where the burden of proof shifts to the Commissioner.

Step 5: Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); *see also Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Rootes suffers from the following severe impairments: cervical spine stenosis with C6-7 disc herniation and osteophyte complex, lumbar spondylitis, left ulnar neuropathy, bilateral mild sensory carpal tunnel syndrome, peripheral neuropathy, and hypertension. (Tr. 28.) The ALJ specifically found that Rootes' reported respiratory impairments and mental impairment of dysthymic disorder did not qualify as severe impairments, and resulted in only minimal functional limitations. (Tr. 28.)

The ALJ further found that Rootes did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, subpart P, Appendix

14

1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). The ALJ then determined that Rootes has the residual functional capacity to perform light work as defined in 20 C.R.R. 404.1567(b), allowing the claimant to sit or stand at will. (Tr. 30.) Based upon Rootes' RFC, the ALJ found that Roots is unable to perform her past relevant work as a plastic production supervisor. (Tr. 37.) However, the ALJ "accommodated [the] claimant's impairments by limiting her to a light level exertion allowing her to alternate to a sitting and standing position at will provided that [she] is not off task more than 10% of the work period" (Tr. 37), and found she is capable of performing jobs that exist in significant numbers in the national economy (Tr. 38.) For example, the ALJ determined Plaintiff could be a production assembler (DOT #706.687-010), small parts assembler (DPT #706.684-022), and electronics worker (DOT #726.687-010). (Tr. 37-38.) Rootes believes that the ALJ committed error by (1) rendering an improper credibility determination; and (2) rendering an improper RFC determination.


Credibility Determination

Rootes claims that the ALJ failed to properly evaluate the credibility of her testimony. Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However,

when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005). Instead, the ALJ must make a credibility determination supported by record evidence and be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight given to the claimant's statements and the reasons for that weight. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security Application, the Seventh Circuit Court of Appeals has noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). This ruling requires ALJs to articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side

> > effect of any medications the individual takes or has taken to alleviate pain or other symptoms;
>
> > 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> > 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and
>
> > 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003).

Here, Plaintiff argues the ALJ rendered an improper credibility determination by failing to create an accurate and logical bridge between the evidence and instead making a cursory conclusion. (DE #28, p. 11, *see Lopez*, 336 F.3d at 539-40.) The ALJ did use some boilerplate or "template" language in initially assessing the credibility of Rootes. In this case, he found:

> > After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's and her sister's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 32.) Almost identical boilerplate language was used and criticized in *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012). There, the Seventh Circuit noted:

One problem with the boilerplate is that the assessment of the claimant's "residual functional capacity" (the bureaucratic term for ability to work) comes later in the administrative law judge's opinion, not "above" – above is just the foreshadowed conclusion of that later assessment. A deeper problem is that the assessment of a claimant's ability to work will often . . . depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.

*Id.* at 645. Yet, as noted by the Court in *Adams v. Astrue*,

While this sort of boilerplate is inadequate, *by itself*, to support a credibility finding, its use, does not make a credibility determination invalid. Not supporting a credibility determination with explanation and evidence from the record does. Where, as here, the ALJ's decision does not use the language in a mechanical fashion, and the ALJ carefully explains how the plaintiff's claimed limitations are 'not supported by the record as a whole,' reversal is not warranted.

*Adams v. Astrue*, 880 F.Supp.2d 895, 906 (N.D. Ill. 2012) (emphasis in original) (citations omitted).

In this case, the ALJ did "consider[] all factors listed in SSR 96-7p." (Tr. 35.) The ALJ carefully compared Rootes and her sister's claimed symptoms and claimed limitations in daily activities to her treatments and other evidence in the record of daily activities. He considered her daily living questionnaire in which Rootes reported she could perform most of her personal care, can prepare meals sometimes, can do laundry and some dishes, and can shop for food and necessities once a week with help. *Id.* He

considered the fact that she takes care of her two grandchildren, including one who is handicapped, even though recognizing that friends and family help out significantly. *Id.* The ALJ also noted that Rootes reported to her occupational therapist on February 27, 2008, that although she drops objects, she is independent in daily activities and independent in all function areas. *Id.* Moreover, at a psychological evaluation, Rootes reported she is independent in self-care. *Id.* An ALJ may discount a claimant's testimony when it conflicts with other statements made by a claimant. *See, e.g., Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) ("[T]he discrepancy between the minimal impairment expected from [claimant's] conditions and her testimony of debilitating pain casts doubt on her credibility." Thus, the ALJ's conclusion that "the claimant's testimony as to limited daily activities is not supported by the record," was explained.

The ALJ also considered the claimant's treatment history, although his analysis on the medical evidence relating to credibility is less thorough. (Tr. 35.) He noted Rootes' reports that her medications somewhat helped, and that following a short course of occupational therapy, she failed to return. (Tr. 35, 267.) The ALJ also noted that although Rootes alleged in an initial report she has headaches, at her physical therapy sessions, she reported the headache pain was a 0 out of 10, and that some pain was rated "as low as 0 . . . ." (Tr. 36, 33, 263-66.)

Plaintiff takes issue with this point though, arguing the ALJ failed to consider her other subjective complaints of pain. *See Pancake v. AMAX Coal Co.*, 858 F.2d 1250, 1255 (7th Cir. 1988) (holding an ALJ may not selectively analyze the record to reach a desired outcome). Rootes points to other indications of pain in the medical record: the March 6, 2008 notification states pain is at a 7/10 for lower back and 7/10 for left lower extremity, and that her feet were "still on fire" (Tr. 265); the March 11, 2008 notation states that pain is rated at 9/10; the March 13, 2008 notation states that pain was 7/10 for the lower back and 7/10 for the lower extremities (Tr. 266); the March 25, 2008 notation states pain was 9/10 and going down the lower extremities (Tr. 263), and the March 27, 2008 notation stated pain was a 5/10 (Tr. 263).

The ALJ also noted that Rootes tried to find work, however, no one was hiring. (Tr. 35.) The parties both admit, though, that the work attempts may have been prior to her alleged onset date. The ALJ did recognize that Rootes reported in her disability report that she stopped working due to personal reasons unrelated to her health, and told her occupational therapist she was retired. (Tr. 36, 171, 178, 276.)

In sum, the ALJ did adequately build an accurate and logical bridge between the evidence or record and his conclusion that Rootes and her sister's testimony was not entirely credible. The ALJ gave reasons for discrediting Rootes' complaints in the hearing

and cited to medical evidence and other evidence of daily activities in the record to support his decision. Although the ALJ may have used some "template" language, the substance of the decision itself supports his credibility determination. *See Smith v. Astrue*, No. 2:11-CV-32, 2012 WL 1435661, at *6 (N.D. W. Va. 2012) (noting that the ALJ's findings could not be classified as "boilerplate language" because the ALJ spent three pages discussing evidence supporting his credibility finding). Here, the ALJ spent 5 pages analyzing and explaining his credibility finding, and that is sufficient. Although not perfect (this Court especially questions the ALJ's analysis of Rootes' subjective complaints of pain), the credibility determination was supported by evidence in the record and this Court cannot say that the credibility determination was "patently wrong." *Skarbek v. Barnhart*, 390 F.3d at 504; *Powers*, 207 F.3d at 435; *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (even where some of the ALJ's findings concerning the claimant's credibility were a bit harsh, "an ALJ's credibility assessment will stand as long as there is some support in the record . . . ."). Therefore, the ALJ's credibility determination, which is entitled to special deference, will be affirmed.

RFC Determination

At step four of the sequential evaluation process, an ALJ must

complete a residual functional capacity assessment pursuant to 20 C.F.R. § 404.1545.  In assessing an applicant's RFC, an ALJ will consider all the relevant medical and nonmedical evidence in the record.  20 C.F.R. 404.1545(a)(3); *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).

Plaintiff urges that the ALJ rendered an improper RFC determination.  First, Rootes claims that the ALJ improperly dismissed the opinion of Dr. Alan Wax, the consultative examiner. Following a psychological evaluation, in his opinion dated June 18, 2008, Dr. Wax found Plaintiff "is disabled due to medical problems and Depression." (Tr. 369.)  The ALJ "[gave] little weight to the statement of the consultative examiner, Dr. Wax, who opined the claimant is disabled. This statement is inconsistent with the evidence of record, including Dr. Wax's own findings." (Tr. 36.) Plaintiff argues that consultative examinations are necessary and an ALJ "must consider all relevant medical evidence, cannot substitute his expertise for that of a qualified physician, and, absent countervailing clinical evidence or a valid legal basis for doing so, cannot simply disregard the medical conclusions of a qualified physician." *Pancake*, 858 F.2d at 1255.

The ALJ rejected Dr. Wax's opinion, finding his statement was inconsistent with his own findings. (Tr. 36.)  For example, the ALJ noted that Dr. Wax found Rootes is independent in self-care and performs most domestic functions. *Id.*  Additionally, Rootes had

suggested that her medical issues, not depression, were disabling to her. *Id.* As the Court found in *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009)(emphasis in original), "[t]he [ALJ] is not required or indeed permitted to accept medical evidence if it is refuted by other evidence - *which need not itself be medical in nature*." Moreover, the ALJ found that because Dr. Wax is a licensed psychologist, he "was not qualified to make an opinion on the claimant's degree of physical functioning." (Tr. 37.) The fact that the ALJ thought that Dr. Wax lacked the medical expertise to determine Rootes' medical impairments (instead of psychological), is a logical explanation of why he discredited that opinion. Finally, it was proper for the ALJ to discount Dr. Wax's statement that Rootes was "disabled," stating it was a "conclusory statement and not a function-by-function assessment of the claimant's ability to work." (Tr. 37.) *See, e.g.*, 20 C.F.R. § 404.1527(d) (An opinion that a claimant is "disabled" is not a medical opinion, but, instead, an opinion on an issue reserved to the Commissioner and will not be given any special significance); *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010) (citations omitted) ("[T]he ALJ is not required to give controlling weight to the ultimate conclusion of disability - a finding specifically reserved for the Commissioner.").

Thus, the ALJ's decision to give little weight to the opinion of Dr. Wax, a licensed psychologist who completed the psychological

evaluation, that Plaintiff was "disabled due to medical problems and Depression" is supported by substantial evidence. *Simila*, 573 F.3d at 515 (declining to give nontreating physician's substantial weight "because it lacked consistency and supportability").

Plaintiff also contends that the ALJ improperly failed to assess any mental limitations. For example, Rootes believes the ALJ overlooked a "limitation to unskilled or simple, repetitive, and routine work despite the clear cognitive issues exhibited by Plaintiff during her psychiatric evaluation with Dr. Wax in the form of a flat mood and affect, memory problems, and the benefit of assistance in managing funds." (DE #28, p. 16.) As mentioned before, the ALJ specifically declined to give weight to Dr. Wax's statement that Rootes was disabled because "it is a conclusory statement and not a function-by-function assessment of the claimant's ability to work." (Tr. 37.) As noted by Defendant, Plaintiff made no claims of disability due to mental impairments in her application (Tr. 31, 171), and did not receive any treatment from a mental health professional (Tr. 28.) Although Plaintiff points out that the non-examining state-agency reviewer Kenneth Nevill, PhD, opined that Rootes suffered from mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace, Dr. Nevill concluded that Plaintiff did not have a severe mental impairment. (Tr. 373, 385.) By definition, a nonsevere mental impairment does not significantly limit a

claimant's ability to do basic work activities.  *See* 20 C.F.R. §
404.1520(c).

Finally, Roots argues that the ALJ improperly dismissed the
treating physician, Dr. Nath's opinion.  A treating physician's
medical opinion must be given controlling weight if it is "well
supported" and not inconsistent with other substantial evidence in
the case record.  20 C.F.R. § 404.1527(c); *see Punzio v. Astrue*,
630 F.3d 704, 710 (7th Cir. 2011).  An ALJ must offer "good
reasons" for discounting the opinion of a treating physician.
*Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell v.
Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).  Furthermore, SSR 96-2p
requires that the ALJ's "decision must contain specific reasons for
the weight given to the treating source's medical opinion,
supported by the evidence in the case record, and must be
sufficiently specific to make clear to any subsequent reviewers the
weight the adjudicator gave to the treating source's medical
opinion and the reasons for that weight."  SSR 96-2p.

If the treating physician's opinion is not well supported or
is inconsistent with other substantial evidence, the ALJ must apply
the following factors to determine the proper weight to give the
opinion:

> (1) the length of the treatment relationship and
> frequency of examination;
>
> (2) the nature and extent of the treatment
> relationship;

(3) how much supporting evidence is provided;

(4) the consistency between the opinion and the record as a whole;

(5) whether the treating physician is a specialist;

(6) any other factors brought to the attention of the Commissioner.

20 C.F.R. §§ 404.1527(c) and 416.927(a)-(d); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). It is reversible error for an ALJ to discount the medical opinion of a treating physician without applying this legal standard and for further failing to support the decision with substantial evidence. *Moss*, 555 F.3d at 561; *see also Punzio*, 630 F.3d at 710 (finding the ALJ's rejection of a treating physician's mental residual functional capacity questionnaire was not substantially supported).

Dr. Nath opined that Plaintiff's lifting, carrying, walking, standing, pushing, and pulling were affected by her condition and that she could never climb, balance, kneel, crouch, crawl, or stoop, and had limited handling (gross manipulation), fingering (fine manipulation), and feeling. (Tr. 446-49.) The ALJ gave this "little weight" finding the opinion "vague and imprecise, as Dr. Nath noted that he [sic.] is unable to assess the claimant's lifting and carrying, as well as her standing and walking limitations." (Tr. 37.) It is true Dr. Nath wrote she was unable to assess the limitations of the lifting/carrying restrictions and

walking/standing restrictions (for example, Dr. Nath could not assess whether Rootes could lift or carry less than 10 pounds, 10 pounds, 20 pounds, etc., and how many hours Rootes could stand/or walk). (Tr. 446.) However, Dr. Nath did specifically find pushing and/or pulling was affected by the impairment, and that Rootes had postural limitations, including that she should never climb, balance, kneel, crouch, crawl, and stoop. (Tr. 447.) The ALJ gave no reasons for not considering these postural limitations found by Dr. Nath, and the ALJ improperly failed to consider them. Additionally, the ALJ also improperly failed to consider the manipulative limitations found by Dr. Nath, including Rootes' limited handling, fingering, and feeling. (Tr. 448.)

Although the ALJ criticized Dr. Nath for basing the opinion "only on diagnostic findings" (Tr. 37), the ALJ did not consider the checklist of factors required by the Social Security regulations in order to determine the appropriate weight to give to Dr. Nath's opinions. *Moss*, 555 F.3d at 561; *see also Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citations omitted) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors."). For example, the ALJ did not consider the length of the treatment relationship with Dr. Nath and frequency of examination, or the nature and extent of

the treatment, or how much supporting evidence was provided by Dr. Nath, and whether the treating physician is a specialist. 20 C.F.R. §§ 404.1527(c), 416.927(c). This requires remand.

The ALJ did note that "[a]t the initial evaluation, Dr. Nath observed that the claimant sat comfortably and had a good range of motion on flexion and extension of the lumbar spine." (Tr. 37.) However, Plaintiff cites to many clinical findings in the record that support Dr. Nath's findings that she is limited from postural activities such as climbing, balancing, kneeling, crouching, crawling, and stooping. (DE #28, pp. 18-19.) Additionally, there is other medical evidence in the record to support Dr. Nath's opinions and her opinions are indeed consistent with other substantial evidence in the record. The record shows that Rootes suffered from absent deep tendon reflexes in the right ankle, reduced motor strength, reduced reflexes, reduced ranges of motion in the cervical spine, lumbar spine, hips, knees, and ankles. (Tr. 291-92, 319, 323, 337, 360, 362-63.) Dr. Nath's assessed hand limitations in handling, fingering, and feeling are also supported by the record where physical examinations found decreased sensation in the upper extremities, decreased grip and pinch strength, decreased sensation in the left hand, neuropathy, and mild sensory carpal tunnel syndromes. (Tr. 249, 268, 323-24, 303, 337.)[1]

---

[1]Defendant argues that even if the ALJ improperly dismissed the treating physician's opinion, that the error is harmless because two of the three jobs the VE identified (small parts

In sum, the ALJ failed to give "good reasons" for discounting the treating doctor's medical opinion, and failed to consider the checklist of factors set forth in Section 1527(d). This case must be remanded so the treating physician's opinions may be properly addressed.

CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

DATED: September 3, 2013          /s/ RUDY LOZANO, Judge
                                  United States District Court

---

assembler and electronics worker), do not require any postural movements. (DE #31, p. 11.) However, these two positions would require handling and fingering, functions which Dr. Nath also found Plaintiff was limited by her impairments.